On 26 March, 1839, William D. Crawford for a debt which he then contracted, executed to Thomas A. Hague (456) three bonds, each for the sum of $1,873 and payable, with interest from date, in one two and three years. The bonds were also executed by Christian Bringle, Charles Fisher and William Watson, as Crawford's sureties. The bond payable in 1840, was assigned, by Hague, to the defendant John Gibson, after it became due; and he instituted a suit on it against the obligors, in which the defendant pleaded certain payment made to Hague and set-off, for the residue. Hague also transmitted to Gibson and one Waddell, or to Waddell alone, the bond that was made payable in March, 1842; and before it fell due they, Gibson and Waddell, or Waddell, sold this last bond to Adam Filhour, for less than the same due it and transferred *Page 350 
it to him by delivery only and without recourse on them or him. Adam Filhour died intestate in December, 1841, out of debts and entitled to a considerable personal estate and leaving a widow and a son, the present plaintiff, and two daughters, the next of kin; and the plaintiff obtained administration of the estate in February, 1842. The bill states that in January, 1842, Gibson came to the late residence of the intestate, where all the family resided together, and, after transacting some trivial business, on pretense of which, he came there, Gibson told the plaintiff privately, that he had understood from an authentic source, that Crawford had become insolvent, and that his sureties had determined to plead usury, against the bond that belonged to his father's estate because he had purchased it for less than its nominal value and suggested, that, as they could only prove the usury, by Gibson, and Waddell, it would be best to transfer that bond to him, Gibson, in exchange for the other bond, which Gibson then all held upon the same parties. The bill then further states that the proposition was communicated to the plaintiff's mother and sisters, all of whom were exceedingly ignorant, in matters of law and that after some deliberation, (457) all four of them, in confidence of the truth of Gibson's representations that the obligors in the bond could avail them selves of the defense of usury and were disposed to take all advantages, agreed to Gibson's proposal and they exchanged the bonds, by mutual delivery only.
The bill then charges, that it was entirely untrue, that the obligors ever intended, or could have been allowed to set up such a defense, as the plaintiff has since discovered and been advised; and that it was a device of Gibson's to practice on the ignorance and inexperience of the plaintiff and his mother and sisters and obtain their bond, which was not yet due and against which, there were no counter claims, for the one then held by himself, against which there were, to his knowledge, alleged payments and counter-demands to the full amount thereof or nearly so. And, as evidence thereof, the bill further charges that the suit, which Gibson had instituted on the bond, due in March, 1840, and held by him, was at that time, January, 1842, still pending and had been for a considerable time, on the pleas of payment and set-off; and that Gibson knew the defendant were ready to support their pleas by proof which would have left nothing or very nearly nothing due on the bond, and therefore he did not brings the suit to trial, but carefully concealed all those facts, from the plaintiff, his mother and sister, and passed the bond off to them as before mentioned, and then dismissed the suit he had brought on it. *Page 351 
The bill further charges, that Gibson refused to rescind the exchange of the bonds, but obtained from Hague an endorsement of the bond he got from the plaintiff and claims it as his absolute property at law.
The bill was filed against Gibson and Crawford and his sureties, and prays that it may be declared, that Gibson effected the exchange of the bond, by fraud, and thereon got from the plaintiff the bond due in March, 1842, without any adequate consideration; and that the contract may be rescinded and Gibson restrained from disposing of the bond, and (458) that, upon the surrender by the plaintiff of the bond now held by him (which he submits to make), the obligors may be decreed to make payment to the plaintiff of the whole principal and interest due on the bond of March, 1842, or to pay him what may still be due, if anything, on the bond of 1840, and that Gibson may be compelled to make good the residue, for which no recovery ought to be had thereon, against the obligors, and for general relief.
Two of the obligors, Fisher and Bringle, answer, that there was never any intention to plead usury against the bond which Adam Filhour first purchased, or to set up any objection to the payment of it. They state, however, as to the other bond, which Filhour now holds, that, after it fell due and before it was passed to Gibson by Hague, their principal, Crawford, had discharged it, either by payments or by set-offs and settlements between Crawford and Hague; and that to the action, which Gibson brought thereon, they made that defense, and believe they could have proved it, and that Gibson became satisfied they could and withdrew his suit for that reason. They insist, that there is nothing due on the bond now held by the plaintiff, and state that on the other bond a suit has been commenced against them by Gibson, the endorsee of Hague, to the use of Thomas Smith, who claims the money; and they submit to pay that debt to whomsoever it may be decreed they ought.
Gibson's answer admits that he brought suit against Crawford and his sureties on the first bond that all fell due, and that the debtors insisted and pleaded, that it was discharged by payments and set-offs. This defendant further admits, that "he exchanged notes with the plaintiff"; but expressly denies all fraud in obtaining the note from the plaintiff. On the contrary he alleges, that the said Michael was willing and anxious to make the exchange. He admits that the told said Michael, to make the exchange. He admits that the he told said Michael, that his father Adam had purchased the note, (459) for less than its nominal value, but he did not assert, that the principal or sureties in said note were determined to *Page 352 
plead usury to it, or advise or request the plaintiff to transfer the same to this defendant to avoid the effects of such plea. He admits that after he obtained the note from the plaintiff he dismissed the suit, he had before brought on the other note, which he had then transferred to the plaintiff." But he denies "that the obligors had made payments or had any set-offs, to the amount of said bond or any considerable part thereof. On the contrary, the claims, as he understands and believes, which they pretended to have against said bond, were neither payments or set-offs — being notes or other claims, obtained by the obligors or some them, from thirds persons, to whom Hague was indebted, and therefore not mutual debts between Crawford and Hague. Defendant did not conceal from plaintiff the fact, that a defense of this kind was set up; but on the contrary informed him, that it was insisted on, but that the defendant did not believe it would be available. He denies that Hague authoried [authorized] the obligors or any of them, to procure debts, which he owed to third persons, and agreed to allow them as payments or set-offs to this bond."
The answer then states, that before this suit was brought the defendant "transferred the bond bond fide, for a full and valuable consideration to Thomas Smith."
By an amended and supplemental bill Smith is made a party, and it is charged, that he is the brother-in-law of Gibson, and took the bond with knowledge that it had belonged to Adam Filhour and of the manner in which Gibson had obtained it from the present plaintiff. and of the circumstance charged in the original bill; and also, that he had obtained judgment on the bond and was about to collect the money, and prayed that he should be enjoined therefrom.
The answer of Smith states, that, before the filing of (460) the bill, he purchased the bond from Gibson bona fide
and for full value paid, and that he had no knowledge of any defense to it either in law or equity, not of any claim of the plaintiff or of any other person to the bond except that of Gibson himself, and insists that he has a right to collect the judgment to his own use.
Upon the answers the injunction, prayed and granted on the bill, was dissolved; and after replication to the answers the cause was set for hearing and sent to this Court, without further evidence.
The Court does not accede to the argument for the plaintiff, that he has a right to relief upon the ground, merely, that his contract with Gibson was before administration granted and without authority, and that the subsequent administration vested the property in him, as administrator, and entitled him to recover the bond. For however that may be at law, yet relief can not be granted in this Court, in a case like this — in which the bill admits, that there were no creditors of the intestate, who owned the bond, and therefore shows that the suit is prosecuted solely for the benefit of the next of kin, who were the equitable owners, and who, as appears in the bill, all united in, or consented to the contract with Gibson. If the plaintiff had recovered at law, as administrator, equity would, at the instance of the defendant, restrain him from collecting the money, because it would be held by him for the persons, who had assigned their interest — which was the whole equitable interest — to the defendant at law; and of consequence, the court of equity can not give original relief in such a case to a mere administrator, in trust for the next of kin. Love v. Love, 38 N.C. 104.
But we are of opinion, that the plaintiff is entitled to a decree upon the merits of the case. Not being the (461) legal assignee, by endorsement, of either of the bonds, he had no action at law in respect of them. His only remedy was in equity, by a decree for payment by either the obligors in the bond, or by the person, Gibson, who passed it to him, as a subsisting security for the principal and interest appearing to be due on it, or out of the funds received or due upon the bond, which was obtained from the plaintiff without adequate consideration.
Here it may be observed, in the first place, that the last bond, in the hands of Smith, is, for the purpose of this cause, subject to be dealt with, as if it were still in the hands of Gibson, because it was not endorsed to Smith, and also because Smith's answer is not supported by any evidence, that he paid anything for the bond, so as to make him a purchaser. He is therefore a volunteer, and the fund in his hands is liable, as if it had remained in the hands of Gibson. Thus considered there is a plain equity for the plaintiff against it, if the bond was improperly obtained from him, and if, by reason of the insolvency of the parties, it should turn out, that the plaintiff should be unable to raise the money upon personal decrees against the obligors or Gibson. The question is, whether the plaintiff is entitled to such personal decree, for what amount and against whom? We think he undoubtedly is entitled to *Page 354 
it for his whole debt and costs, against either Crawford and his sureties, or against Gibson. Crawford and one of the sureties suffered the bill to be taken for confessed, and the other securities say that all or nearly all the money has been paid on the bond passed by Gibson to the plaintiff, and they submit to pay any balance that may be due thereon. The only question, as to them, is, then as to the sum, if any, remaining due on this bond; which will, according to the course of the Court, be the subject of an inquiry before the master. The only remaining question is, whether the plaintiff has not also a right to a decree against Gibson and the fund accruing from (462) the other bond; and we hold clearly that he has.
The defendant's answer is an extraordinary and not a fair one, as to the circumstances which led to the exchange of bonds. The account given in the bill is a natural and probable one, and the answer does not meet it, but equivocates. It denies indeed "all fraud in obtaining the bond. But how? Because, it says,"the plaintiff was willing and anxious to make the exchange." That was never denied by the plaintiff. But the question is, why he became thus anxious — at whose instance, and upon what inducements or representations? The bill tells the reasons; but the answer, though admitting the fact of the exchange, assigns no consideration whatever, that could have moved either party to it, that is, if the answer be taken, according to its generalities as it was probably intended to be understood, and without adverting to the cautious and special pleading manner in which it is expressed. The defendant says "that he did not assert that the principal or his sureties were determined to plead usury," and that "he did not advise or request the plaintiff to transfer the bond to him, to avoid theeffect of such plea." But at the same time he admits, "that he informed the plaintiff, that his father bought it for less than its nominal value," and he gives no reason, why he was led to make that communication, nor tells of its effect on the plaintiff and his mother and sisters, nor denies that those persons made the exchange, under the influence of that communication nor gives any other fact or reason, that could have induced it but that suggestion of this defendant's. It is impossible not to see, that the answer keeps back much and material parts of what passed, and well deserves to be called a dishonest answer — such as ought not to be put into any bill. For without some such inducement as that stated in the bill, the transaction (463) is the most unaccountable, that men in their senses ever made. Gibson had already a suit pending on the bond of March, 1840, and it had been standing for trial on *Page 355 
"payment and set-off" for a considerable time. Now, both of the bonds were for precisely the same sum, with interest from the same day. Why then should either party wish to exchange? Why does not the defendant inform us of his reason for wishing or consenting to it? He does not intimate that it was to oblige his friend, Filhour, though, he represents the latter as so anxious for the bargain. The defendant then acted, not from a disposition to serve the plaintiff, but to serve himself. It is to be remembered, that by the exchange Gibson not only got but a bond for the same sum, which, upon its face, was due on the other bond, but also that he would thereby be put to the delay of a new suit on the bond, and have to pay the costs of the suit, which he had brought on the other bond. We should have liked this party to have told us, how he could have made such a bargain as this: and we doubt not he would have told it distinctly enough, if, as the bill states, he had not believed, that the defendants, in the suit he had brought, would, to some extent, at least, make good their defense, and, in order to shift that loss from himself, procured an exchange of bonds with the family of Filhour, by hints and innuendoes, that induced them to expect a defense, which would defeat their suit, on the bond which they held, and to think they might recover the same sum on the other bond. It is true, the answer denies that the defendant concealed that the obligor insisted on the discharge of the bond he was to let him have, but he was obliged to admit, that he told the plaintiff, that there were in fact no payments or set-offs, that would or could legally be allowed, and indeed, he insists in his answer that there are none, for the reasons therein assigned. It is clear, therefore, that Gibson passed this bond as one, on which the whole sum mentioned in it and the interest were then due, and ought to be recovered by the plaintiff; and therefore, that if it should turn out to the contrary, on the inquiry ordered, he ought in conscience, (464) to make it good, for what the plaintiff received it. At present we need not carry the decree to Smith, because, if the plaintiff can get the money decreed to him from the obligor and Gibson, that will satisfy him and there is no suggestion of the insolvency of either of those persons. If, however, they should be insolvent, then certainly Smith, if he has received the money, must answer the decree against Gibson; and perhaps also that against the other parties, if they have become insolvent pending the present proceedings. As to the last point though, there is no occasion to give any opinion, as it will stand over as one of the equities reserved for further *Page 356 
directions. There must accordingly be a reference to ascertain what sum is due upon the bond, held by the plaintiff, from the obligors, after deducting all payments and set-offs, legal and equitable, against the same; and whether the obligors are now able to pay the same, or if not, when they became unable.
PER CURIAM. DECREED ACCORDINGLY.
Cited: Outlaw v. Farmer, 71 N.C. 35; McNeill v. Hodges, 83 N.C. 511;Baker v. R. R., 91 N.C. 310.
(465)